### NATIONAL SECURITY ARCHIVE, Appellant,

v.

### U.S. DEPARTMENT OF DEFENSE.

### No. 88–5217.

United States Court of Appeals, District of Columbia Circuit.

Argued May 25, 1989.

Decided July 28, 1989.

---

18. "Only strong public policies weigh against disclosure," *United States v. Procter & Gamble,* 356 U.S. at 682, 78 S.Ct. at 986.

Joseph N. Onek, with whom Clifford M. Sloan and David L. Sobel, Washington, D.C., were on the brief, for appellant.

Gregory C. Sisk, Atty., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief, for appellee.

Before ROBINSON, MIKVA and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

The Freedom of Information Reform Act of 1986 amends the Freedom of Information Act by providing for reduced fees for certain types of document requests made by any entity that qualifies as "an educational ... institution" or as "a representative of the news media." Based upon its "collect[ion] and disseminat[ion of] comprehensive government documentation pertaining to selected issues of major public concern in the areas of foreign, defense, intelligence, and international economic policy," the National Security Archive requested that the Department of Defense classify it as, alternatively, "an educational ... institution" or "a representative of the news media." Pursuant to regulations it had adopted defining those two statutory terms, DoD denied the request. The Archive challenged that denial in district court, and on cross-motions for summary judgment, the court affirmed DoD's determination. 690 F.Supp. 17. We now affirm in part and reverse in part. We hold that the Archive is not an educational institution, but that it is a representative of the news media. In that capacity, it is eligible for preferential pricing under FOIA.

### I. Statutory Scheme

As originally enacted in 1974, FOIA required generally that a person requesting records pay the costs of searching for and duplicating the documents requested, but provided, elliptically, that an agency must waive or reduce such fees if to do so would be "in the public interest because furnishing the information can be considered as primarily benefitting the general public." 5 U.S.C. § 552(a)(4)(A) (1982). Through FIRA, Congress revised this framework by directing government agencies to adopt fee regulations in compliance with a detailed set of statutory specifications that varies an agency's ability to charge fees depending both upon whether a requester has a particular status and upon whether the specific request is for a commercial or a noncommercial purpose.

As thus amended, FOIA initially provides that an agency may properly charge a FOIA requester a fee sufficient to recover: the cost of searching for documents within the scope of the request; the "direct" cost of initially reviewing any documents unearthed by the search in order to determine whether they are disclosable; and the cost of duplicating the documents that are disclosed. 5 U.S.C. § 552(a)(4)(A)(iv). An agency may require anyone making a request "for commercial use," 5 U.S.C. § 552(a)(4)(A)(ii)(I), to reimburse it for all three types of recoverable costs. With respect to a request "not ... for commercial use," the agency may normally exact a fee based upon the costs of search and of duplication, but may not recover the cost of its review. 5 U.S.C. § 552(a)(4)(A)(ii)(III). An exception is made, however, in cases of a request "not ... for commercial use" that is made by "[1] an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or [2] a representative of the news media." 5 U.S.C. § 552(a)(4)(A)(ii)(II). In such

cases, an agency may impose upon the requester only the cost of duplicating the records it releases. *Id.* In addition to these preferences based upon the nature both of the requester and of the request, FIRA provides a new standard for case-by-case waiver of fees for any request that is "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the Government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

## II. ANALYSIS

The Archive argues that it qualifies for preferential fee treatment under FOIA as, alternatively, an educational institution or a representative of the news media. The Government disputes both claims, of course, but it also argues that DoD's interpretation of FIRA, as reflected in its implementing regulations, is "owed great deference" by the court under the rule in *Chevron USA, Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Archive denies that *Chevron* applies, arguing that the *de novo* review provision of FIRA, 5 U.S.C. § 552(a)(4)(A)(vii), which applies "[i]n any action by a requester regarding the waiver of fees under this section," governs the questions this case presents. We need not resolve this dispute, however. Even viewing the matter *de novo,* we do not believe that the Archive qualifies as an educational institution under FIRA. Contrariwise, even if we are to defer to an agency's reasonable interpretation of an ambiguous statutory term, the statute, read in light of the legislative history, *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9, is clear: Congress intended that an organization like the Archive qualify as a representative of the news media. We thus have no occasion to inquire into the reasonableness of DoD's conclusion to the contrary.

### A. *"An Educational Institution"*

 DoD's regulation provides that

[t]he term "educational institution" refers to a preschool, a public or private elementary or secondary school, an institution of graduate higher education, an institution of professional education and an institution of vocational education, which operates a program or programs of scholarly research.

32 C.F.R. § 286.33(e)(4). Assuming that our review is *de novo,* the question before us is whether the term refers exclusively to schools, as DoD maintains, or whether, as the Archive contends, we should read the statute more broadly to include "institutions that disseminate information to the public," such as a "non-profit private research institution and library" that makes its holdings available for public use.

The ordinary meaning of the term "educational institution" is "school." The Archive does not dispute this point, but argues instead that we should not read "educational institution" as a single idiomatic term, but rather as a noun and an adjective. That is to say, the Archive suggests that we determine whether it is an institution the purpose of which is educational. Because (1) the Archive is an entity ("institution") that (2) seeks to make information available to the public ("educational"), it contends that (3) it is an "educational institution" under FIRA; it is all as simple as (1) plus (2) equals (3).

We have no occasion, however, to evaluate the Archive's claim to be an institution with an educational purpose, for we are unwilling to adopt the strained interpretation of the statutory term that would make that question relevant. It is often the case that two words, used in conjunction, convey a meaning different from that which they would bear if interpreted separately. For instance, the common understanding of the term "parking ticket" is a notice of fine for the violation of a law governing the parking of vehicles. The Archive's interpretive approach, as applied to this example, would dictate that we read the term to refer to a ticket that has to do with parking, and therefore broaden it to include a permit to park in a particular lot.[*] We would be

---

[*] As applied to the term "monkey business," on the other hand, the Archive's approach would

disinclined to adopt such a strained construction of "parking ticket."

The weakness in the Archive's position is reflected in its own argument when it points out that the Internal Revenue Service recognizes that "organizations, like Archive, that disseminate information to the public," are "organized and operated exclusively for ... educational purposes" within the meaning of 26 U.S.C. § 501(c)(3). The Archive suggests that we adopt a similar reading of "educational institution" in FIRA. If, like § 501(c)(3), FIRA referred to "institutions operated for an educational purpose," we might well agree with the Archive's interpretation, but the language of FIRA is different. The Archive's argument shows only that when Congress means a statute broadly to cover organizations that provide services that can be characterized as "educational," it has a model near to hand. It knows how to use it, too. *See, e.g.,* 15 U.S.C. § 77c(a)(4) (exempting from registration requirements of Securities Act of 1933 "[a]ny security issued by a person organized and operated exclusively for ... educational ... purposes ..."). *Cf.* 12 U.S.C. § 1706e(k)(2) (defining as "qualified community organizations" under urban homestead programs entities that are, among other things, "exempt organizations under paragraph (3) or (4) of section 501(c) of Title 26"). Congress's use of the term "educational institution" here, on the other hand, suggests to us that it intends FIRA to apply to the narrower category of entities suggested by the ordinary meaning of that term.

Our reading of the statute is also supported by its legislative history. In the 98th Congress, Representatives English and Kindness sponsored a bill to, *inter alia,* modify the fee provisions of FOIA. Included among the preferred requesters under that bill were not only educational institutions and representatives of the news media as in FIRA, but also "nonprofit group[s] that intend[ ] to make information available to the news media, any branch or agency of Federal, State or local government, or the general public." H.R. 6414,

98th Cong. § 4 at 9 (1984). That bill died, but its lineal descendant surfaced in the 99th Congress, when Senators Leahy and Hatch cosponsored an amendment to the Anti Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (Oct. 27, 1986), that included fee provisions virtually identical to those in the earlier House bill. It was this amendment that eventually became FIRA. As part of an apparent legislative compromise, however, not all the language from the earlier House bill was preserved. Conspicuous by their absence from the preferred category were "nonprofit group[s] that intend [ ] to make information available [etc.]."

The Archive claims to be an educational institution based solely upon its intention to make the information it receives through FOIA requests available to scholars, the news media, and the general public in its "non-profit research institute and library." The implication to be drawn from Congress's shortening the list of preferred requesters in the version of FIRA that was finally enacted, as compared with the list in the earlier House bill, counts strongly against the Archive's being preferred on the ground that an organization that engages in those activities is an educational institution. The obvious implications are that an organization that "makes information available" is not an educational institution, and that the longer list included, and the shorter list does not include, such organizations. The Archive strives mightily to provide an alternative, non-obvious interpretation of the difference in the bills, based upon the remarks of several of FIRA's cosponsors. That legislative history is insufficient, however, to persuade us to depart from the obvious interpretation of Congress's deletion of the above-quoted language.

The amendment to the anti-drug bill that became FIRA was proposed on the floor of the Senate in the closing days of the 99th Congress. Accordingly, it was enacted in haste and without having been referred to the committees that would normally have generated a legislative history to which we

yield a narrow definition that does not even include the ordinary meaning of the term.

could look for guidance as to the meaning of the statute. In such circumstances, the Supreme Court has held that we must look to the statements of the sponsors of the bill as "the only authoritative indications of congressional intent." *North Haven Board of Education v. Bell,* 456 U.S. 512, 527, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982).

Here, the floor statements of the cosponsors are in conflict. Senator Hatch explained, when the bill was initially presented to the Senate, that the elimination of the language covering entities that intend to make information available to others meant that the revised fee provisions "are not intended to permit a fee waiver to any requester simply on the basis of his status as a disseminator of public information.... Of course, a true 'media' requester, in the traditional and common sense meaning of that term, should be treated otherwise, as is clearly provided for in the plain language of the bill." 132 Cong.Rec. S16505 (daily ed. Oct. 15, 1986). Senator Leahy, on the other hand, indicated that he thought that "FOIA requesters engaged in the dissemination of information to the public—and that of course is the primary function of libraries and private repositories of public documents—would qualify for waiver or reduction of fees under the FOIA." 132 Cong.Rec. S16496 (daily ed. Oct. 15, 1986). He provided no explanation, however, for the deletion of the language that would clearly have applied to such entities. *See id.;* 132 Cong.Rec. S14298 (daily ed. Sept. 30, 1986). In the House, Representatives English and Kindness acknowledged the deletion of the relevant language, but contended that the deletion was without effect because Senator Leahy's statements, and their statements to the same effect, constituted the legislative history of the statute, and that "[i]t is unnecessary, therefore, to amend the text of the bill since the intent has been so clearly stated." 132 Cong.Rec. H9463 (daily ed. Oct. 8, 1986).

In sum, the Senate amendment omitted the precise language of the earlier House bill that would have covered the Archive; one of the sponsors of the bill indicated that the omission was intended to change the meaning of the bill, and the others disagreed. Although the legislators were thus apprised of the two different interpretations, they were apparently content to vote without resolving the dispute, thus punting the issue to the courts. In this circumstance, we must fall back upon the conventional inference that a change in legislative language is not without effect; any other recourse would require the court to devise a defensible principle, for use when the sponsors' statements are "the only authoritative indications of congressional intent," by which to weigh the sponsors' conflicting statements—but the Archive suggests none, and we do not see one. We are left, then, with the sponsors of the bill in conflict; we cannot, therefore, rely upon any of their statements to supply a meaning that we do not find on the face of the statute when read as ordinary language.

We conclude that the Archive is not, merely because it intends to make information available to the public, an educational institution, and that, to the extent that DoD's regulations provide that only schools are eligible for that status, those regulations mirror congressional intent.

B. *"A Representative of the News Media"*

■ The Archive may yet achieve preferred status under FIRA if it qualifies as "a representative of the news media." Viewed in isolation, it is not self-evident what that term covers, but when we turn to the legislative history of FIRA for guidance, we see that the sponsors were not in any disagreement relevant to the resolution of this issue; they unambiguously envisioned that an organization such as the Archive comes within the term.

Although the parties are at odds over how to describe the Archive's activities, the differences in their descriptions are tonal rather than substantive. What the Archive does is not open to serious doubt; it is whether its activities qualify as those of a representative of the news media that forms the real ground for debate. The Archive relies upon a number of its different endeavors to support its claim to be a

representative of the news media. With one key exception, however, each of those endeavors is, in the end, a way of making information available to the public; for reasons we have already explored, such activities are insufficient to establish an entitlement to preferred status. The single exception is the Archive's plan to act, in essence, as a publisher, both in print and in other media.

The Archive has previously published only one book (entitled *The Chronology: The Documented Day–By–Day Account of the Secret Military Assistance to Iran and the Contras*), but it has expressed a firm intention, which DoD does not here question, to publish a number of what it refers to as "document sets." Each of the document sets it had planned at the time of the administrative proceedings will be devoted to a particular topic of current interest, including current United States policies toward various countries and regions, aspects of nuclear weapons policy, relations between the superpowers, the structure of major alliances and of the non-aligned movement, etc. *See, e.g.*, A Development Grant Proposal for the National Security Archive at 8–11 (March 1, 1986) (Grant Proposal).

The Archive will obtain the raw materials for its document sets not only by means of FOIA requests but also from: papers declassified by the Government under the Mandatory Declassification Review process; interviews with, and private records of, present and former government officials; official statements, publications, and press releases; court opinions and records; testimony before Congress; newspaper and periodical accounts of recent events; and reports by congressional committees and the General Accounting Office. *See id.* at 4–6. From these documents, the Archive's staff will cull those of particular interest in a given subject area to form the core of each document set. The staff will then supplement the chosen documents with "detailed cross-referenced indices, other finding aids, and a sophisticated computerized retrieval system" in order to make it more accessible to potential users. Declaration of R. Scott Armstrong at 1 (May 4, 1987). Sales of microform copies of these document sets will be the Archive's main source of revenue, apart from foundation grants. *See* Grant Proposal at 12; Brief for the Appellee at 6–7.

The activities we have just described are, we think, well within the range that Congress ascribed to a "representative of the news media." The relevant legislative history is simple to state: because one of the purposes of FIRA is to encourage the dissemination of information in Government files, as Senator Leahy (a sponsor) said: "It is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected.... In fact, *any person or organization which regularly publishes or disseminates information to the public ... should qualify for waivers as a 'representative of the news media.'*" 132 Cong.Rec. S14298 (daily ed. Sept. 30, 1986) (emphasis added). Representatives English and Kindness echoed Senator Leahy's sentiments: "A request by a reporter or other person affiliated with a newspaper, magazine, television or radio station, *or other entity that is in the business of publishing or otherwise disseminating information to the public* qualifies under this provision." 132 Cong.Rec. H9463 (Oct. 8, 1986) (emphasis added). In the light of this catalog of examples, "representative[s] of the news media," a term which we are to interpret broadly, clearly encompasses the Archive, whose compilation and distribution of document sets is surely "publishing or otherwise disseminating information." Unlike merely, in the words of the original House bill, "mak[ing] information available" in the Archive's private research institute and library, the Archive's intended distribution of document sets entails the kind of initiative we associate with "publishing or otherwise disseminating" that information.

DoD attempts to minimize the significance of this legislative history by suggesting that Senator Hatch was of a different mind. DoD points to this part of his explanation of the sponsors' decision not to include some of the language from the original House bill:

[O]rganizations seeking to establish *private repositories* of public records shall not qualify for a waiver. These groups purport to act as an *intermediary* between the Government and requesters in seeking records that requesters could seek directly from the Government. This type of *private library* of public documents, whether operated for profit or not, should not qualify for a waiver. . . .

132 Cong.Rec. S14040 (Sept. 27, 1986) (emphases added). The Senator later reiterated this concern: "[I]nformation vendors, data brokers, and other second-hand disseminators of documents who do so at a price as the means of their economic self-sufficiency, should not qualify . . . under any reasonable construction of the term 'media.'" 132 Cong.Rec. S16505 (Oct. 15, 1986).

As we read Senator Hatch's statement, he was concerned only with two groups. The first group, comprised of "private librar[ies]" or "private repositories," we have already determined to be without the preferred category. The second group, middlemen ("intermediar[ies]" or "information vendors [or] data brokers") that request documents for use by others, seems to refer to organizations that "purport to act" on behalf of specific parties ("requesters"); the implication is that the "requesters" themselves are either unaware that they could get records "directly from the Government," or simply find it more efficient to employ a service. The Archive does not, however, make FOIA requests as an agent for others who want access to government documents; it gets the documents for its own purpose, which is to assemble them, along with documents from other sources, into an encyclopedic work that it will then offer to the public. There is simply no indication that Senator Hatch had in mind an organization that, like the Archive, gathers information from a variety of sources; exercises a significant degree of editorial discretion in deciding what documents to use and how to organize them; devises indices and finding aids; and distributes the resulting work to the public. Without suggesting that any one of these activities is either necessary or sufficient for a person or organization to be a "representative of the news media," we think it clear that an organization that engages in all of them "publishes or otherwise disseminates information to the public" and is thus well within that concept. What is more, we do not read Senator Hatch to say anything to the contrary.

■ A representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. Surely when a newspaper publisher, such as the New York Times Company, brings out *The Pentagon Papers* in the form of a paperback book, adding perhaps an introduction and an index, it is acting as a representative of the news media every bit as much as when it publishes a daily newspaper; and as we have seen, that is the same sort of venture as, indeed one involving less editorial input than, the one in which the Archive is engaged.

Accordingly, we conclude that the Archive is a representative of the news media within the meaning of FIRA.

## C. *The Archive's Alleged "Commercial" Purpose*

■ Finally, DoD contends that, even if the Archive is a representative of the news media, "those entities that fall within the preferred fee category must also establish that the records 'are not sought for a commercial use.'" As far as it goes, this statement is entirely accurate; there is no reason to treat an entity with news media activities in its portfolio, such as CBS, Inc. or the Washington Post Co., as a "representative of the news media" when it requests documents, from let us say the SEC, in aid of its nonjournalistic activities.

DoD pushes the point further, however, contending that the Archive's intention to sell its document sets may itself be a commercial purpose. DoD's regulation defining the general contours of "commercial use" does define that term as "a use or

purpose that furthers the commercial, trade, or profit interest of the requester." 32 C.F.R. § 286.33(e)(3)(i). Its specific regulation regarding requests by representatives of the news media provides, however, that "[a] request for records supporting the news dissemination function of the requester shall not be considered a request that is for a commercial use." 32 C.F.R. § 286.33(e)(7)(ii). Thus, at least insofar as the Archive will use the fruits of its FOIA requests as raw material for its document sets (as it represents it will), such requests will not, under the DoD regulation, "be considered a request that is for a commercial use."

DoD's argument to the contrary here would also frustrate Congress's purpose to give the news media special status. Most news media organizations are for-profit enterprises. Yet DoD would require that they pay the full fee for documents they request in support of their news-gathering and publication functions. DoD's argument is contrary to the manifest purpose of FIRA, the plain meaning of the applicable regulation, and common sense. Accordingly, we reject it.

### III. CONCLUSION

The Archive is not an educational institution. On the other hand, based upon the Archive's submissions (which DoD has offered us no reason to doubt), it is a representative of the news media by reason of its publication activities; therefore, insofar as its requests are in furtherance of that function, the Archive is entitled to be charged only for duplication costs. We note, however, that our conclusion is writ on paper in ink; it is not chiselled in granite. If the Archive's intention to publish works derived from the documents it requests does not pan out, it will be open to DoD to argue that the Archive is no longer a representative of the news media. Absent such a change in circumstances, however, the Archive is entitled to preferred status.

*So Ordered.*