**ELECTRONIC PRIVACY INFORMATION CENTER, Plaintiff,**

v.

**DEPARTMENT OF DEFENSE, Defendant.**

**No. CIV.A.02–1233 (JDB) ECF.**

United States District Court, District of Columbia.

Jan. 16, 2003.

David L. Sobel, Marc Rotenberg, Washington, DC, for plaintiff.

Peter S. Smith, Heather Graham–Oliver, Special Assistant United States Attorney, Washington, DC, for defendant.

## *MEMORANDUM OPINION*

BATES, District Judge.

This matter comes before the Court on a motion for a preliminary injunction by plaintiff Electronic Privacy Information Center ("EPIC"). EPIC is a non-profit educational organization that disseminates information to the public on privacy, technology, and civil liberties issues. EPIC has sought certain records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, relating to the Information Awareness Office of the Department of Defense ("DoD") and its Director, John Poindexter, and challenges the decision of DoD denying its request for preferred fee status under FOIA as a "representative of the news media." Under the fee provisions of FOIA, representatives of the news media are not charged the costs and fees that ordinarily would be assessed for processing and duplicating requested documents. EPIC contends that it regularly publishes and disseminates an electronic newsletter and has written and published several books on privacy and civil liberties issues, thus qualifying as a representative of the news media under DoD regulations.

Although presented as a motion for a preliminary injunction, the parties have agreed to consolidate the preliminary injunction with the merits of EPIC's claims pursuant to Fed.R.Civ.P. 65(a)(2). In light

of the controlling Court of Appeals ruling in *National Security Archive v. Dep't of Defense*, 880 F.2d 1381 (D.C.Cir.1989), the Court concludes that EPIC's activities satisfy DoD's definition of a representative of the news media, and therefore enters judgment for EPIC entitling it to preferred fee status under FOIA.

## BACKGROUND

### A. Freedom of Information Reform Act

Congress amended FOIA's fee provisions through the Freedom of Information Reform Act of 1986 ("FIRA") in an effort to "keep fees from becoming an unnecessary barrier to disclosure." 132 Cong. Rec. H9464 (daily ed. Oct. 8, 1986) (Joint Analysis of Reps. English and Kindness). Originally, FOIA required requesters to pay the costs of searching for and duplicating documents, but allowed agencies to waive or reduce fees if the information would "be considered as primarily benefitting the general public." 5 U.S.C. § 552(a)(4)(A) (1982). Under the FIRA amendments, government agencies must adopt fee regulations waiving or reducing search and duplication fees depending on the requester's status and on whether the requested records are for a commercial or non-commercial purpose. *See Nat'l Security Archive*, 880 F.2d at 1382.

Under FIRA, "when records are requested for commercial use," an agency may charge the fees related to document search, duplication, and review. 5 U.S.C. § 552(a)(4)(A)(ii)(I). However, if the records are sought for non-commercial use, and the requester qualifies for one of three preferred status categories, an agency may only charge fees for document duplication (over 100 pages):

[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution, whose purpose is scholarly or scientific research; or a representative of the news media.

5 U.S.C. § 552(a)(4)(A)(ii)(II). Hence, FOIA, as amended by FIRA, now grants "preferred status" to qualifying requesters—educational and scientific organizations, or news media—by limiting or waiving the fees associated with their requests. *Nat'l Security Archive*, 880 F.2d at 1385; *Media Access Project v. FCC*, 883 F.2d 1063, 1065 (D.C.Cir.1989).

Those requesters who do not qualify for one of the three preferred status categories, and do not request documents for commercial use, fall within the "other" fee category under FIRA, and are charged for document search and duplication, but not for document review. Moreover, any requester may have its fees reduced or waived entirely if the material sought is for a noncommercial use and "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government." 5 U.S.C. § 552(a)(4)(A)(iii).

Here, EPIC seeks preferred status as a "representative of the news media." DoD denied that request because EPIC is a non-profit public interest organization that does not meet DoD's definition of "representative of the news media." Instead, DoD placed EPIC in the "other" fee category, which would require EPIC to pay the full document search and duplication fees related to its FOIA request. The sole issue before this Court is whether EPIC qualifies as a representative of the news media for purposes of the FOIA fee provisions as applied in DoD's regulations.

### B. EPIC's FOIA Request

On February 21, 2002, EPIC sent a written FOIA request to DoD seeking "all

agency records concerning the Information Awareness Office; its director, Admiral (retired) John Poindexter; and Syntek Corporation." Pl. Motion, Ex. 1 (letter from Madsen to DoD). EPIC sought preferred fee status under FIRA, asking to be "placed in the category of 'news media' requester." *Id.* In support of that request, EPIC stated:

> EPIC publishes a biweekly electronic newsletter, issues regular public reports and analyses, and maintains a free on-line electronic library. EPIC staff members are also regular contributors to numerous newspapers, newsletters, magazines, and law reviews. Any information that is obtained as a result of this request will be disseminated through these publications and others.

*Id.* DoD denied EPIC's request for news media status on March 1, 2002. Pl. Motion, Ex. 2 (letter from McIntyre to Madsen). According to DoD, in order to qualify as a representative of the news media under DoD's regulations, a FOIA requester must actively gather news (*i.e.*, "information that is about current events or that would be of current interest to the public") for an entity that is organized and operated to publish or broadcast news to the public. *Id.* DoD noted that "[i]t is very doubtful that a large majority of these [requested] documents would qualify as 'news' as defined [by DoD regulations]." *Id.* Instead, DoD placed EPIC in the "other" fee category under FIRA, requiring EPIC to pay all search and duplication fees incurred in processing EPIC's request. *Id.* DoD advised EPIC that "a search for documents responsive to your request will not be initiated until we receive your willingness to pay fees that you may incur as an 'other' requester." *Id.*

On March 12, 2002, EPIC appealed DoD's decision denying it news media status. EPIC explained that it "routinely and systematically disseminates information to the public." Pl. Motion, Ex. 3, at p. 2 (letter from Madsen to DoD). It noted that its website "highlights the 'latest news' concerning privacy and civil liberties," and that its organization "publishes a bi-weekly electronic newsletter that is distributed to more than 15,000 readers, many of whom report on technology issues for major news outlets." *Id.* EPIC also pointed out that it "publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues." *Id.* EPIC attached 50 pages of documents from its website, including its homepage, a web page displaying scanned images of documents EPIC obtained through FOIA requests, a web page displaying an archive of past EPIC newsletters, and a list of EPIC publications. *Id.*

DoD denied EPIC's appeal on April 16, 2002:

> [Y]ou state that 'EPIC is a non-profit, educational organization that routinely and systematically disseminates information to the public.' You state that EPIC is an educational organization that disseminates information instead of being an entity that is both *organized and operated to disseminate information.* Additionally, the EPIC internet website states that 'EPIC is a public interest research center.' Therefore, I am denying your appeal for EPIC to be considered a representative of the news media, and accordingly it should be classified as an 'other' requester.

Pl. Motion, Ex. 4, p. 1 (letter from Cooke to Madsen) (emphasis in original).

On May 10, 2002, EPIC sought further reconsideration of DoD's decision. EPIC reiterated its claim that it was "organized and operated to publish or broadcast news to the public":

We maintain a heavily visited Web site that highlights the 'latest news' concerning privacy and civil liberties issues. These featured news items reflect EPIC's editorial judgment concerning what is newsworthy for our audience, and include EPIC's analysis of information derived from a variety of sources, including material obtained under the FOIA.

. . .

EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues. . . . [T]hese paper publications reflect EPIC's analysis of information derived from various sources and which we believe is of interest to our audience.

Pl. Motion, Ex. 5 at pp. 2–3 (letter from Madsen to DoD).

However, on May 28, 2002, DoD again denied EPIC's request for reconsideration:

While I do not deny that EPIC disseminates information in a number of ways, I contend that while an organization has an ability to disseminate it does not necessarily follow that it is organized and operated to publish or broadcast news to the public. . . . Your web site states that 'EPIC is a public interest research center in Washington, D.C. It was established in 1994 to focus public attention on emerging civil liberties issues.' This statement, which seems to be the primary statement to the public about the mission of EPIC, does not contend that EPIC is organized to publish or broadcast news. Rather, it states that EPIC conducts research and focuses public attention.

Pl. Motion, Ex. 6 at p. 1 (letter from Cooke to Madsen). DoD advised EPIC that is has "a right to judicial review of these decisions in a United States District Court in accordance with Title 5 USC § 552(a)(4)(A)(B)." *Id.* EPIC then brought this action seeking a determination that it is a representative of the news media under FIRA and DoD's regulations.

## C. Standard of Review

This Court has jurisdiction to review agency decisions regarding fee waivers under FIRA, including determinations regarding news media status. *See* 5 U.S.C. § 552(a)(4)(B). DoD argues that courts should review agency denials of news media status under the deferential "arbitrary and capricious" standard of the Administration Procedure Act, 5 U.S.C. § 706(2)(A). EPIC contends that under FIRA, courts review fee waiver determinations, including preferred fee status determinations, under a de novo standard. FIRA in fact states that "waiver" determinations are to be reviewed de novo:

In any action by a requester regarding the waiver of fees under this section, the court shall determine the matter de novo: *Provided,* That the court's review of the matter shall be limited to the record before the agency.

5 U.S.C. § 552(a)(4)(A)(vii). DoD counters that this provision applies to fee "waivers," not fee category determinations such as news media status.

The meaning of "regarding the waiver of fees" is not defined or otherwise made clear in FIRA itself. Senator Hatch, one of the key Senate sponsors of FIRA, explained the de novo review standard as follows:

[T]his provision limits significantly the de novo review standard found in H.R. 6414. It strikes the words "reduction or" to specify that de novo review is to apply only to the waiver provisions of this section. Thus, de novo review applies to review of eligibility of scholar[s], bonafide news representatives, and commercial requesters for waivers. It does not apply to reductions of fees requested

under the standards of (iii). These reduction issues will continue to be reviewed under the arbitrary and capricious standard.

132 Cong. Rec. S14040 (daily ed. Sept. 27, 1986) (remarks of Sen. Hatch). Although DoD contends that a "waiver" determination is not the same as a preferred fee "category" determination, Senator Hatch seems to characterize determinations of news media status under FIRA as "waivers" to be reviewed de novo.[1]

Other courts have reviewed agency determinations of news media eligibility pursuant to a de novo standard. *See, e.g., Judicial Watch v. Dep't of Justice*, 185 F.Supp.2d 54, 59 (D.D.C.2002) (court conducted de novo review of determination of news media status, stating that "[m]any of the judges of this Court have concluded that 5 U.S.C. § 552(a)(4)(A)(vii) is applicable in this situation and, based on the express language of that section, therefore have conducted a de novo determination") (citations omitted); *Judicial Watch v. Dep't of Justice*, 133 F.Supp.2d 52, 53 (D.D.C.2000); *Judicial Watch v. Dep't of Justice*, No. 99–CV–2315 (CKK), 2000 WL 33724693 (D.D.C. Aug.17, 2000); *Hospital and Physician Publishing, Inc. v. Department of Defense*, No. 98–CV–4117–JPG, 1999 WL 33582100 at *2 (S.D. Ill. June 22, 1999) ("The Court reviews requests [for news media status] de novo"); *but see Judicial Watch v. Dep't of Justice*, 122 F.Supp.2d 5, 11–12 (D.D.C.2000) (applying arbitrary and capricious standard for review of news media eligibility). The statutory language, judicial authority, and FIRA's legislative history thus support the view that determinations regarding preferred fee status are reviewed de novo. In light of the holding in *National Security Archive*, and that court's observation on the applicable standard of review, this Court need not resolve the issue because the outcome of this case is the same under either standard. *See Nat'l Security Archive*, 880 F.2d at 1383 (court "assum[ed] that our review is de novo," but noted that "even if we are to defer to an agency's reasonable interpretation of an ambiguous statutory term, the statute, read in light of the legislative history, is clear: Congress intended that an organization like the Archive qualify as a representative of the news media").

## ANALYSIS

EPIC contends that it qualifies as a representative of the news media because it regularly publishes books and newsletters containing news and analysis about privacy, technology, and civil liberties issues. DoD counters that EPIC does not meet its definition of "news media" because it is not organized and operated to publish news. Resolution of the issue is governed by *National Security Archive*, which construed FIRA's "representative of the news media" provision and DoD's fee waiver regulations.

### A. *National Security Archive*

In a number of important ways, EPIC's claims mirror those raised in *National Security Archive*, where the court ruled that an organization similar to EPIC was "a representative of the news media by reason of its publication activities." 880 F.2d at 1388. The Archive, a tax-exempt non-

---

1. DoD argues that de novo review applies only to "waiver" determinations, not to preferred fee decisions. But Senator Leahy, the other chief Senate sponsor of FIRA, specifically characterized the determination whether an organization is a representative of the news media as a "waiver." *See* 132 Cong. Rec. S14298 (daily ed. Sept. 30, 1986) ("any person or organization which regularly publishes or disseminates information to the public ... should qualify for waivers as a representative of the news media").

profit research organization, sought documents from DoD and, like EPIC, requested "news media" status. The Archive claimed that it qualified as a representative of the news media because it "collect[ed] and disseminat[ed] comprehensive government documentation pertaining to selected issues of major public concern in the areas of foreign, defense, intelligence, and international economic policy." *Id.* at 1382.

For guidance on construing the term "representative of the news media," the court turned to FIRA's legislative history:

Viewed in isolation, it is not self-evident what that term covers, but when we turn to the legislative history of FIRA for guidance, we see that the sponsors were not in any disagreement relevant to the resolution of this issue; they unambiguously envisioned that an organization such as the Archive comes within the term.

. . .

The relevant legislative history is simple to state: because one of the purposes of FIRA is to encourage the dissemination of information in Government files, as Senator Leahy (a sponsor) said: "It is critical that the phrase 'representative of the news media' be broadly interpreted if the act is to work as expected. . . . If fact, *any person or organization which regularly publishes or disseminates information to the public . . . should qualify for waivers as a 'representative of the news media.'* " Representatives English and Kindness echoed Senator Leahy's sentiments: "A request by a reporter or other person affiliated with a newspaper, magazine, television or radio station, *or other entity that is in the business of publishing or disseminating information to the public.*"

*Id.* at 1385–86 (emphasis in original). In concluding that the Archive came within

the "news media" category, the court found one key fact determinative:

The Archive relies upon a number of its different endeavors to support its claim to be a representative of the news media. With one key exception, however, each of these endeavors is, in the end, a way of making information available to the public; . . . such activities are insufficient to establish an entitlement to preferred status. The single exception is the Archive's plan to act, in essence, as a publisher, both in print and other media.

*Id.* Using documents sought through FOIA and other sources, the Archive intended to publish materials on matters of government and foreign policy:

The archive has previously published only one book . . . but it has expressed a firm intention to publish a number of what it refers to as "document sets," . . . devoted to a particular topic of current interest, including current United States policies toward various countries and regions, aspects of nuclear weapons policy, relations between the superpowers, the structure of major alliances and of nonaligned movement.

*Id.* at 1386. "Unlike merely . . . 'making information available' in the Archive's private research institute and library, the Archive's intended distribution of document sets entails the kind of initiative we associate with 'publishing or otherwise disseminating' that information." *Id.*

The Archive's works, the court stressed, reflected the substantive editorial input associated with "publishing or otherwise disseminating information":

[The Archive] gets the [requested] documents for its own purposes, which is to assemble them, along with documents from other sources, into an encyclopedic work that it will then offer to the public. . . . [T]he Archive gathers informa-

tion from a variety of sources; exercises a significant degree of editorial discretion in deciding what documents to use and how to organize them; devises indices and finding aids; and distributes the resulting work to the public. Without suggesting that any one of these activities is either necessary or sufficient for a person or organization to be a "representative of the news media," we think it clear that an organization that engages in all of them "publishes or otherwise disseminates information to the public" and is thus well within that concept. *Id.* at 1387. In short, the court of appeals in *National Security Archive* held that "[a] representative of the news media is, in essence, a person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience." *Id.*

### B. EPIC's Publishing Activities

EPIC fits that description. EPIC's request for "news media" status highlighted its publication to date of seven books on privacy, technology and civil liberties issues:

> EPIC publishes and distributes printed books that address a broad range of privacy, civil liberties and technology issues. A list of EPIC publications was previously provided. Similar to our website and newsletter, these paper publications reflect EPIC's analysis of information derived from various sources and which we believe is of interest to our audience.

Pl. Motion, Ex. 5, at pp. 3–4 (letter from Madsen to DoD dated May 10, 2002). In *National Security Archive*, the Archive had published just one book, but planned to publish a set of documents on national and international politics and nuclear policy. EPIC has compiled and published seven books on national and international policies relating to privacy and civil rights, including *Privacy and Human Rights 2001: An International Survey of Privacy Laws and Developments; Cryptography and Liberty 2000: An International Survey on Encryption Policy; Technology and Privacy: The New Landscape; The Consumer Law Sourcebook 2000: Electronic Commerce and the Global Economy;* and *Filters and Freedom 2.0: Free Speech Perspectives on Internet Content Controls.* These books address issues of "current interest to the public"—DoD's definition of news. As the court put it in *National Security Archive,* so, too, EPIC is a representative of the news media because of its "plan to act, in essence, as a publisher, both in print and in other media." 880 F.2d at 1386.

EPIC gleans the information it publishes in its books from a wide variety of sources, including FOIA requests, · state and federal courts, government agencies, universities, international groups, law reviews, interest groups, and even other news sources.[2] EPIC researches issues on privacy and civil liberties, reports on this information, analyzes relevant data, evaluates the newsworthiness of material and puts the facts and issues into context, publishing and distributing this "news" through the sale of its books to the public. All these activities are hallmarks of publishing, news, and journalism. As EPIC explained, "[a]ny information that is obtained as a result of this [FOIA] request will be disseminated through these publications and others." Pl. Motion, Ex. 1.

---

**2.** As EPIC explained in its appeal to DoD, these books "include EPIC's analysis of information derived from a variety of sources, including material obtained under FOIA." Pl. Motion, Ex. 5 at 2.

Hence, EPIC "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience." *Nat'l Security Archive*, 880 F.2d at 1387.

DoD contends that EPIC cannot qualify as a representative of the news media because it is organized as a "public interest research center" rather than to disseminate information. DoD asserts that it was Congress's intent that "public interest groups such as EPIC do not fall within the media (most favorable fee) category." Pl.'s Motion, Ex. 6 at 1 (letter from Cooke to Madsen dated May 28, 2002). DoD fails to acknowledge, however, that, like EPIC, the National Security Archive is "a public interest, scholarly research institute." *Nat'l Security Archive v. Dep't of Defense*, 690 F.Supp. 17, 19 (D.D.C.1988). More importantly, the key for the court of appeals in *National Security Archive* was not the organization's "description"; instead, "it is whether its activities qualify as those of a representative of the news media that forms the real ground for debate." *Nat'l Security Archive*, 880 F.2d at 1385. Labels and titles alone, therefore, do not govern; the organization's substantive activities control.

DoD has also refused to characterize EPIC as a representative of the news media because it is a tax-exempt entity under 26 U.S.C. § 501(c)(3). There is nothing in DoD's regulations, or in FIRA itself, that states that tax-exempt corporations are excluded from news media status. Again, the National Security Archive, like EPIC, was "a non-profit corporation to which the Internal Revenue Service (I.R.S.) has granted tax-exempt status as an entity organized and operated exclusively for educational purposes" under 26 U.S.C. § 501(c)(3). *Nat'l Security Archive*, 690 F.Supp. at 19; *see also* 880 F.2d at 1384.

The determinative issue, once again, is the organization's "activities," not its corporate structure.

Simply put, there are no material differences between the National Security Archive and EPIC for purposes of the news media status determination. Like the Archive, EPIC's publication and sale of numerous books in the areas of privacy and civil liberties qualify it as "a representative of the news media." Indeed, the publication of books in which EPIC has already actually engaged far surpasses the publishing plan that was, standing alone, sufficient in *National Security Archive* to conclude that DoD erred under FIRA and DoD regulations in denying news media status to the Archive.

## C. EPIC's Biweekly Newsletter

DoD's own regulation establishes that EPIC is a representative of the news media for another reason—it publishes a periodical, the EPIC Alert, which is a biweekly electronic newsletter. The regulation defines "representative of the news media" in broad language as "any person actively gathering news for an entity that is organized and operated to publish or broadcast news to the public," and lists "publishers of periodicals" as an example of the news media:

> Examples of news media entities include television and radio stations broadcasting to the public at large, and publishers of periodicals (but only in those instances when they can qualify as disseminators of "news") who make their products available for purchase or subscription to the general public.

DoD Freedom of Information Act Program Regulation, 32 C.F.R. § 286.28(e)(7)(i) (2002); *see also* DoD Reg. 5400.7–R, at C6.1.5.7.1.

After Congress passed FIRA in 1986, the Office of Management and Budget

("OMB") promulgated final guidelines implementing FIRA and containing a uniform schedule of fees applicable to all agencies subject to FOIA.[3] In denying EPIC's request for news media status, a DoD official argued that EPIC failed to meet OMB's definition:

> While I do not deny that EPIC disseminates information in a number of ways, I contend that while an organization has an ability to disseminate it does not necessarily follow that it is organized and operated to publish or broadcast news to the public. As a matter of fact, a review of the information you provide on your web site shows that EPIC does not meet the OMB definition.

Pl. Motion, Ex. 6 at p. 1 (letter from Cooke to Madsen dated May 28, 2002). But after receiving public comment on its proposed guidelines, OMB explained that publishers of newsletters are included within OMB's definition of "representative of news media":

> [N]ewsletter publishers and their representatives [ ] were concerned that the guidelines could be read to exclude them from qualifying as "representatives of the news media." ... It was not OMB's intention to exclude the publishers of newsletters from this category. The examples provided in the definition were not intended to be all-inclusive. Certainly newsletters, if they meet all of the other criteria, would qualify as "representatives of the news media" for purposes of this definition. To avoid implying any such limitation, OMB has replaced the references to

"newspaper" and "magazine" in the definition with the word "periodical."

52 Fed.Reg. at 10014 (guidelines implementing FIRA provisions). Of course, under DoD's own regulation—based upon the OMB guidelines—"publishers of periodicals" are specifically listed as an example of the news media.

EPIC certainly is a "publisher of periodicals."[4] As it explained:

> EPIC publishes a bi-weekly electronic newsletter that is distributed to over 15,000 readers, many of whom report on technology issues for major news outlets. The newsletter reports on relevant policy developments of a timely nature (hence the biweekly publication schedule). It has been published continuously since 1994 and an archive of past issues is available at our web site.

Pl.Ex. 3 at p. 2 (letter from Madsen to DoD dated March 12, 2002). EPIC's newsletter reports on the "latest news concerning privacy and civil liberties issues" and "feature[s] news items [that] reflect EPIC's editorial judgment concerning what is newsworthy for our audience, and include[s] EPIC's analysis of information derived from a variety of sources, including material obtained under FOIA." Pl. Motion, Ex. 5 at p. 2 (letter from Madsen to DoD dated May 10, 2002). Every two weeks, for the past eight years, EPIC has published and disseminated its newsletter. EPIC's newsletter, moreover, "disseminat[es] news"—*i.e.*, "information that is about current interest to the public"—on court cases and legal challenges, government policies, legislation, civil rights, surveys and polls, legislation, privacy abuses,

---

3. FIRA specifically required OMB to develop and issue a schedule of fees and guidelines to implement the statute. *See* 5 U.S.C. § 552(a)(4)(A)(i); 52 Fed.Reg. 10012 (March 12, 1987).

4. DoD regulations do not define the term "periodical." However, a "periodical," unlike a daily newspaper, has been defined simply as "a publication issued at regular intervals of more than one day." *See* American Heritage Dictionary, Second College Edition, at p. 923 (2000).

international issues, and trends and technological advancements.[5] In fact, EPIC's newsletter is sent to many journalists and writers, which is some evidence that the information constitutes "news." EPIC makes its newsletter, as well as its archive of past newsletters, easily accessible, and allows anyone to subscribe to the newsletter, free of charge, by simply signing up on EPIC's website. The newsletter has a large circulation of 15,000 subscribers. Hence, through its newsletter EPIC is a "publisher of [a] periodical" that "disseminat[es] news," and EPIC "make[s][its] products available for purchase or subscription to the general public."

The fact that EPIC's newsletter is disseminated via the Internet to subscribers' e-mail addresses does not change the analysis. DoD's regulation states that the examples of news media cited "are not meant to be all-inclusive." 32 C.F.R. § 286.28(e)(7)(i). More importantly, the regulation anticipates technological advancements, recognizing that "as traditional methods of news delivery evolve (e.g., electronic dissemination of newspapers through telecommunications services), such alternative media would be included in [the news media] category." *Id.*[6]

This Court is not alone in finding an organization like EPIC to be a publisher of periodicals, and thus a news media entity. The Federal Communications Commission, for example, has found that organizations similar to EPIC, which regularly publish newsletters, are eligible for news media status under FIRA. *See, e.g., Media Access Project v. FCC*, 883 F.2d 1063, 1070 (D.C.Cir.1989) ("In the case *sub judice*, the Commission virtually concedes that petitioners [People for the American Way] and [Union of Concerned Scientists] would qualify for preferred status as representatives of the news media" due to their "regular publication of a newsletter or periodical."). In the end, in light of EPIC's publication and distribution of its biweekly newsletter reporting on privacy and civil liberties issues, the Court concludes that EPIC is a publisher of a periodical, and therefore falls within DoD's definition of a representative of the news media.[7]

Finally, it is worth noting that both the National Security Agency and the Defense Technical Information Center (a component of DoD) have classified EPIC as a representative of the news media—employing the same regulation that DoD uses here to deny EPIC such status. *See* Pl. Motion, Exs. 7–8. In fact, the National Security Agency, applying the DoD regulation, granted EPIC news media status just thirteen days before EPIC filed its FOIA

---

5. For example, news articles in EPIC's newsletter have included: "Ohio Court Upholds Privacy of SSNs"; "Congress to Review National ID Card Proposals"; "Paying for Big Brother: Surveillance Funding in the DOJ Budget"; "Supreme Court to Hear Megan's Law Cases"; "DC Council Attacks Camera System, Adopts Regulations"; "FCC Solicits Comments on Telemarketing"; "Survey Shows Workplace Monitoring Continues to Rise"; "House Passes Federal Agency Privacy Bill"; and "FTC Proposes Telemarketing Do–Not–Call List." *See* http://www.epic.org/news/2002.

6. Of course, not every organization with its own newsletter will necessarily qualify for news media status under FIRA. At a minimum, newsletters must be published regularly, over a period of time, and must disseminate actual "news" to the public, rather than solely self-promoting articles about that organization.

7. On the other hand, the Court is not convinced that a website is, by itself, sufficient to qualify a FOIA requester as a "representative of the news media" entitled to preferred fee status. Virtually every entity in the Washington area—businesses, law firms, trade associations, etc.—as well as many individuals, has a website, but certainly all are not entitled to news media status for fee determinations.

request with DoD. Moreover, the Federal Bureau of Investigation and the Federal Trade Commission have also classified EPIC as a representative of the news media under FIRA. *See* Pl. Motion, Ex. 1 (letter from Madsen to DoD dated Feb. 21, 2002). DoD makes no effort to explain or distinguish the fact that four other federal agencies—two applying DoD's regulation—have granted EPIC news media status.

### CONCLUSION

The Court concludes that, given its publication activities, EPIC satisfies the definition of "representative of the news media" under FIRA and DoD's regulation. EPIC's regular publication and dissemination of its biweekly electronic newsletter, as well as the publication of seven books, qualify it for preferred fee status under the ruling in *National Security Archive v. Dep't of Defense.* Accordingly, judgment will be entered in favor of EPIC. A separate order will be issued on this date.

### ORDER

Upon consideration of the complaint and motion of the Electronic Privacy Information Center (EPIC) seeking injunctive and declaratory relief against the Department of Defense, the memoranda of the parties, oral argument, and the entire record herein, it is hereby

ORDERED that EPIC's motion is GRANTED; and it is further

ORDERED that the Department of Defense must classify EPIC as a "representative of the news media" for preferred fee status under the Freedom of Information Act ("FOIA") with respect to the FOIA request EPIC submitted on February 21, 2002. The Department of Defense shall

process EPIC's FOIA request expeditiously.

IT IS SO ORDERED.