COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-09-023-CV

 

JOE KAUFMAN                                                                   APPELLANT

 

                                                   V.

 

ISLAMIC SOCIETY OF ARLINGTON,                                         APPELLEES

TEXAS, ISLAMIC CENTER OF
IRVING, 

DFW ISLAMIC EDUCATIONAL 

CENTER, INC., DAR ELSALAM


ISLAMIC CENTER, AL
HEDAYAH 

ISLAMIC CENTER, ISLAMIC 

ASSOCIATION OF TARRANT
COUNTY, 

AND MUSLIM AMERICAN
SOCIETY 

OF DALLAS

 

                                              ------------

 

           FROM THE 153RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                            Introduction








Appellant Joe Kaufman appeals the trial court=s denial
of his traditional motion for summary judgment against appellees Islamic
Society of Arlington, Texas; Islamic Center of Irving; DFW Islamic Educational
Center, Inc.; Dar Elsalam Islamic Center; Al Hedayah Islamic Center; Islamic
Association of Tarrant County; and Muslim American Society of Dallas.[1]  Appellees move to dismiss the appeal.  We deny appellees= motion
to dismiss, we reverse the trial court=s denial
of Kaufman=s summary judgment motion, and
we render judgment for Kaufman.

                                        Background
Facts

In 2007, the Islamic Circle of North America
[ICNA] Dallas, along with Aall DFW
Masajid[2]
and Islamic Centers,@ (as stated in a promotional
flyer) sponsored Muslim Family Day at Six Flags Over Texas in Arlington.  Six Flags scheduled the event for October 14,
2007.  The flyer for the event stated
that tickets could be purchased from appellees Islamic Society of Arlington,
Texas and Islamic Center of Irving, among other groups.








On September 28, 2007, the Front Page Magazine
website[3]
published an article by Joe Kaufman titled, AFanatic
Muslim Family Day.@ 
That article related:

On Sunday, October 14, 2007, Six Flags Over Texas, a Dallas-area
amusement park, will be invaded by a radical Muslim organization that has
physical ties with the Muslim Brotherhood and financial ties to Hamas.  While most patrons of the park come for the
games and rides, those involved with this group=s event, Muslim Family
Day, may very well have found an original and appealing way to spread
anti-Western hatred.

 

The Islamic Circle of North America (ICNA), an umbrella organization
for South Asian-oriented mosques and Islamic centers throughout the United
States and Canada, has been in existence for over three decades.  Those that founded it had done so in order to
create an American arm for the Muslim Brotherhood of Pakistan, Jamaat-e-Islami
(JI), and never has ICNA relinquished that connection.  Indeed, just one year ago, ICNA was the top
donor of a JI charity, the Al-Khidmat Foundation (AKF), that provided tens of
thousands of dollars to the head of Hamas, Khaled Mashaal.

 

Apart from its working relationship with terrorists abroad, ICNA does
an exceptional job of portraying itself as Amainstream.@  The group
runs annual functions, in a number of cities, that are presented as family
entertainment.  The same will be the
case, next month, when members of ICNA embark on Arlington, Texas, at Six Flags
Over Dallas, for their Muslim Family Day.

 








Co-sponsoring the day is the Islamic Association of North Texas (IANT)
a.k.a. the Dallas Central Mosque.[4]  IANT has helped to raise hundreds of
thousands of dollars for the legal defense of Hamas operative Ghassan Elashi
and his four brothers, one of which was on the mosque=s board.  The Elashis have been tied to a Hamas
financing ring, which included an internet company . . . and an Islamic
charity, Holy Land Foundation for Relief and Development (HLF).  A Dallas trial regarding the Elashis and HLF,
which began in July, is currently in its closing stages.

 

The upcoming event will feature prayer sessions at the Music Mill
Theatre, halal[5]
food vendors, and Islamic organization tables offering the latest in extremist
propaganda.  As well, drawing parallels
to Hamas TV=s late Mickey Mouse
look-alike, Farfur, Muslim Family Day will offer a Bugs Bunny and Friends
parade.

 

This is not the first time ICNA has used Six Flags to spread its
message.  The group holds yearly events
at Six Flags= Great Adventure in New
Jersey, the most recent of which took place in September of 2006.  While many would consider it a harmless
gesture for an organization to rent out an amusement park, with regard to ICNA,
nothing is harmless.

 

As stated previously, ICNA was found to have been a recent donor to
Hamas.  However, ICNA has also been
involved in the financing of Al-Qaeda. 
Shortly before (and after) the attacks on 9/11, ICNA=s Southeast division
called on its website viewers to give Amaterial support@ to their brethren in
Chechnya.  Attached to this call was a
link to one of the main websites raising funds and recruiting fighters for
Al-Qaeda and the Taliban.  The site,
Jihad in Chechnya, was produced by Azzam Publications, named for the mentor of
Osama bin Laden, Abdullah Azzam. 
Additionally, one of the individuals involved in the creation of the
website, Mazen Mokhtar, who has since been indicted on charges of tax fraud,
was a featured speaker at different ICNA and ICNA-affiliate events.

 








Over time, ICNA has worked to create various radical projects.  Among them are its youth wing, Young Muslims
(YM), and a web information center called Why Islam?  [The logos of YM and Why Islam? are found on
the homepage of the Muslim Family Day website.][6]  Both of these institutions provide forums on
the Internet for members and organization leaders to converse with one
another.  Found on the forums have been
support for overseas terrorist organizations and calls for violence against
Americans and Jews.

 

. . .
.[7]


 

While using images of cartoon characters and sponsoring events at
amusement parks may seem innocuous, the danger that the [ICNA] poses to the
United States, Canada[,] and others is clear. 
As a faction of the Muslim Brotherhood, the organization looks to impose
Islam on Western society, and as a donor to a terrorist organization, the group
is a willing participant in the act of violence.

 

ICNA=s Muslim Family Day that
will occur on October 14, 2007 is nothing but a charade, created to spread
hatred, but veiled in a way to make the sponsoring organization look
harmless.  Six Flags will play host
to this dangerous farce.  If events, such
as these, are allowed to continue, more and more Americans could become
desensitized to those groupsCfifth columns[8]
within our borders that wish to do us harm. 
It is up to those concerned to speak out against these travesties that
threaten our way of life.

 








Americans Against Hate will be leading a protest outside Six Flags
Over Texas, on Sunday, October 14th to call attention to ICNA=s ties to terrorist
financing.  Those that wish to get
involved are asked to e-mail . . . .

 

The Front Page Magazine website included a
graphic that contained the Six Flags logo and incorporated the word AJIHAD@ written
in what appeared to be dripping red letters over an outline of the state of
Texas.  About nine thousand people
attended Muslim Family Day.  Kaufman
appeared at the event; he picketed with other protestors along a roadway
outside of Six Flags= property while carrying a sign
that stated, ASix Flags Over Terrorists.@

Appellees filed this lawsuit against Kaufman in
October 2007.  That month, the trial
court denied Kaufman=s special appearance and also
granted appellees= application for a temporary
injunction against Kaufman, prohibiting him from threatening to take unlawful
action against any of appellees or their members or causing or threatening to
cause bodily injury to any of appellees or their members.  In November 2007, Kaufman filed his original
answer.








On April 4, 2008, Kaufman filed a no-evidence
motion for summary judgment on appellees=
defamation and intentional infliction of emotional distress claims and on their
request for exemplary damages.  On April
18, 2008, appellees filed their fourth amended petition,[9]
which alleged that Kaufman generally used his website to incite hate against
Islamic organizations and citizens and that he specifically used the website to
attack appellees= association with Muslim Family
Day by giving the impression that Athe
supporters and sponsors of the [event] are terrorists or supporters of
terrorism.@ 
The petition requested injunctive relief related to Kaufman=s
existing and future internet publications and nominal damages.[10]








On October 21, 2008, appellees filed a motion for
partial summary judgment, attaching affidavits[11]
and other documents that they asserted established their defamation claims
beyond any genuine issue of material fact and as a matter of law.  In the motion, appellees conceded that much
of Kaufman=s article was Adevoted
to discussions of [ICNA]@ and its financial links to
Islamic groups unconnected to appellees.[12]  However, they contended that the article Amakes no
distinction among the event=s sponsors@ by
referencing A>these
groups= as
sympathizers or supporters of an enemy.@[13]








Six days after filing their motion for partial
summary judgment, appellees filed their response to Kaufman=s
no-evidence summary judgment motion. 
The same day that appellees filed their response, Kaufman filed a
traditional motion for summary judgment. 
Kaufman attached an affidavit to that motion, which included statements
that 

$                  
he learned of Muslim Family Day while researching issues related to
terrorism, he discovered ICNA=s relationship to Hamas through Muslim websites,
and he Awrote the at-issue
article [and created the graphic and the >Six Flags Over Terrorists= sign] . . . in
order to expose [his] research regarding ICNA and its ties to Hamas@;

 

$                  
he has never doubted the truth of the statements in his article,
because he conducted Ahours of extensive
research@ before publishing them;
and

 

$                  
he never specifically identified any group or individual other than
ICNA and IANT, and he had Ano intention whatsoever to implicate any of
the  [appellees] with terrorism or
nefarious activity,@ because he had Ano knowledge that the majority
of the [appellees=] entities even existed.@

 








Kaufman also attached to his motion (1) appellees= written
discovery responses, (2) Google search result pages, (3) a deposition
transcript,[14]
and (4) evidence that he claimed substantiated the facts in his article about
ICNA and IANT=s ties to terrorism.

On November 6, 2008, appellees filed a response
to Kaufman=s traditional summary judgment
motion.  They objected to portions of
Kaufman=s
summary judgment evidence, asserted that he is not a media defendant for the
purposes of First Amendment protection because he only communicates his
articles through the internet (rather than in print or through radio or television),
and reiterated their belief that Kaufman=s
statements were defamatory as a matter of law.








After Kaufman filed a response to appellees= partial
summary judgment motion and he filed proposed findings of fact and conclusions
of law, in January 2009, the trial court sent all counsel a letter informing
them that it was denying all parties= motions
for summary judgment and that it was sustaining some of appellees=
objections to Kaufman=s summary judgment evidence.[15]  The trial court then formally entered an
order reflecting the decisions it had communicated through its letter.[16]  Kaufman filed his notice of this
interlocutory appeal.

                              Our
Jurisdiction Over This Appeal

Appellees have filed a motion to dismiss Kaufman=s
appeal, contending that we lack jurisdiction to consider it.  Kaufman has responded by arguing that section
51.014(a)(6) of the civil practice and remedies code authorizes his
interlocutory appeal.[17]  See Tex. Civ. Prac. & Rem. Code
Ann. ' 51.014(a)(6)
(Vernon 2008).

An order denying a motion for summary judgment is
interlocutory and generally not appealable. 
Astoria Indus. of Iowa, Inc. v. SNF, Inc., 223 S.W.3d 616, 623
(Tex. App.CFort Worth 2007, pet. denied)
(op. on reh=g).  However, section 51.014(a)(6) provides
that a party may appeal an interlocutory order that 








denies a motion for
summary judgment that is based in whole or in part upon a claim against or
defense by a member of the electronic or print media, acting in such capacity,
or a person whose communication appears in or is published by the electronic or
print media, arising under the free speech or free press clause of the First
Amendment to the United States Constitution, or Article I, Section 8, of the
Texas Constitution, or Chapter 73.[18]

 

Tex. Civ. Prac. & Rem. Code Ann. ' 51.014(a)(6);
see Tex. A & M Univ. Sys. v. Koseoglu, 233 S.W.3d 835, 842B43 (Tex.
2007); SNF, Inc., 223 S.W.3d at 623; Fort Worth Star‑Telegram
v. Street, 61 S.W.3d 704, 708 (Tex. App.CFort
Worth 2001, pet. denied).  We strictly
construe statutes giving us jurisdiction over interlocutory appeals.  See Tex. S. Univ. v. Gilford, 277
S.W.3d 65, 71 (Tex. App.CHouston [1st Dist.] 2009, pet.
filed); Am. Online, Inc. v. Williams, 958 S.W.2d 268, 271 (Tex. App.CHouston
[14th Dist.] 1997, no pet.).








In their dismissal motion and in their brief,
appellees contend that Kaufman=s
interlocutory appeal under section 51.014(a)(6) is improper because he has
failed to establish that he is a Amember
of the electronic or print media,@ as the
section requires.  Specifically, they
assert that Kaufman cannot be a media defendant under section 51.014(a)(6)
because he Amerely posts to the internet,@ because
Front Page Magazine is simply Kaufman=s own internet
blog (an assertion that is belied by the affidavits discussed below), and
because Kaufman has not demonstrated that he has the training associated with
traditional journalism.  Kaufman asserts
that he is a media defendant under that section 51.014(a)(6) because, among
other reasons, he published his article on Muslim Family Day Ain his
role as a journalist . . . regarding a national issue of public concernCterrorism.@  The parties have asserted that Kaufman=s status
as a media defendant under section 51.014(a)(6), considering the online nature
of his article and graphic that are the subject of appellees=
defamation claims, is an issue of first impression.[19]

In SNF, Inc., we explained that to

determine the scope of
our jurisdiction, we look to the legislature=s intent in enacting section 51.014(a)(6).  Unless a statute is ambiguous, we discern
that intent from the language of the statute itself.  We cannot construe a statutory provision to
lead to an absurd result if the provision is subject to another more reasonable
interpretation.  Further, we consider the
provisions of a statute as a whole and not in isolation.

 








SNF, Inc., 223 S.W.3d at 626 (footnotes and citations
omitted).  We then opined that a Aplain
reading of this language evidences clear legislative intent that a party
seeking summary judgment on claims or defenses that implicate free speech be
entitled to appeal a trial court=s denial
of this relief.@ 
Id.; see Koseoglu, 233 S.W.3d at 842B43; TSM
AM‑FM TV v. Meca Homes, Inc., 969 S.W.2d 448, 451 (Tex. App.CEl Paso
1998, pet. denied) (stating that by providing for an interlocutory appeal,
Section 51.014(a)(6) permits Acourts
to sort out unmeritorious libel cases before the cases enter[] the time‑consuming
and expensive trial phase@).

The evidence contained in the appellate record
and submitted through additional affidavits filed in this court[20]
establishes the following:








$                  
Kaufman is a full time investigative journalist who has been writing
for national publications since 1995 and who focuses primarily on terrorism
issues by gathering information from Agovernment publications, public government
documents, and Muslim websites@;

 

$                  
Kaufman writes regularly for Front Page Magazine, which is a Anational publication
which focuses mainly on the issues of politics and terrorism and has a monthly
readership of approximately 500,000.A  Kaufman
has published more than one hundred articles on Front Page Magazine;

 

$                  
Kaufman does not control whether Front Page Magazine publishes news
stories that he submits to it, and he does not control whether Front Page
Magazine edits such pieces if selected for publication.  Front Page Magazine is published by the David
Horowitz Freedom Center;

 

$                  
Horowitz is the editor-in-chief of Front Page Magazine.  Horowitz is a nationally recognized author
and political commentator who has written several books, has spoken to over
three hundred colleges, and has appeared on several television programs.  Horowitz publishes Kaufman=s news and commentary
because, according to Horowitz, Kaufman is Aamong the few journalists investigating ties
between domestic individuals . . . and [terrorist] organizations@;

 








$                  
Kaufman is the co-founder and chairman of the board of directors for
Americans Against Hate, which is a Florida nonprofit organization that has
other executive officers; and 

 

$                  
Kaufman has given Anumerous speeches at various conferences and
educational institutions,@ and he has @appeared on most of the
major television networks, including Fox News, CNN, MSNBC, and CNBC.@

 

We believe that these facts and circumstances,
establishing (1) Kaufman=s journalistic background and
his notoriety outside of the parameters of the article and graphic at issue and
(2) Front Page Magazine=s broad readership and its
existence as a news/commentary medium that is independent from Kaufman=s
articles, are sufficient to qualify Kaufman as a Amember
of the electronic or print media@ and to
qualify Front Page Magazine as an electronic or print medium in which Kaufman=s
article and graphic appeared.  We cannot
agree with appellees that Front Page Magazine=s
internet status alone[21]
costs Kaufman his benefit to file an interlocutory appeal as a member of the
electronic media[22]
for several reasons.








First, authority that we consider instructive on
this issue indicates that articles communicated through the internet equate in
legal effect in some circumstances to words published by more traditional
electronic or print media.  For instance,
in Nationwide Bi‑Weekly Admin., Inc. v. Belo Corp., the federal
Fifth Circuit Court of Appeals considered how the Texas Supreme Court would resolve
a statute of limitations issue regarding libel in an internet publication.  512 F.3d 137, 143 (5th Cir. 2007).  In applying the same statute of limitations
rule to internet publications that Texas applies to traditional publications,
the Fifth Circuit noted that 

some courts have reasoned
that the Afunctional similarities
between print and Internet publication@ support application of the single publication
rule to both types of media.  As one
court noted, AA statement
electronically located on a server which is called up when a web page is
accessed, is no different from a statement on a paper page in a book lying on a
shelf which is accessed by the reader when the book is opened.@

 

Id. at 144 (citations
omitted).

 













Second, although appellees negatively
characterize the internet=s use as an avenue of
communication in their attempt to distinguish it from more traditional media,[23]
the United States Supreme Court has extended First Amendment protections to
information published through the internet. 
See Reno v. Am. Civil Liberties Union, 521 U.S. 844, 874B85, 117
S. Ct. 2329, 2345B51 (1997).  In Reno, after examining the
background, growth, and characteristics of the internet,[24]
the Court held that there is no basis for Aqualifying
the level of First Amendment scrutiny that should be applied to [the internet]
medium.@  Id. at 870, 117 S. Ct. at 2344; see
also In re Does 1B10, 242
S.W.3d 805, 820 (Tex. App.CTexarkana
2007, orig. proceeding) (stating that A[s]peech
over the Internet is afforded no lower level of First Amendment scrutiny@).








Third, as Kaufman has argued, Texas Supreme Court
precedent signals that when the text of a statute logically authorizes the
application of the statute to a new technology or communication medium, we
should apply the statute in that way.  In
San Antonio & A.P. Ry. Co. v. Sw. Tel. & Tel. Co., the court
examined a statute related to condemnation of property for the installation and
maintenance of telegraph lines.  93 Tex.
313, 318B19, 55
S.W. 117, 117 (1900).  The issue before
the court was whether that same statute applied to condemnation for telephone
lines, even though the statute did not specifically mention telephone lines
because telephones had just recently been invented when the telegraph statute
was enacted.  Id. at 317B19, 55
S.W. at 117.  In holding that the
telegraph statute did apply to telephone lines, the court reasoned in part that
if a statute=s Alanguage
used is broad enough to embrace a subsequently developed method, the later
invention might be controlled by the pre‑existing law, as if it had been
in existence at the time the law was made.@  Id. at 318, 55 S.W. at 117; see
also Marcus Cable Assocs., L.P. v. Krohn, 90 S.W.3d 697, 705 (Tex. 2002)
(explaining that the supreme court=s
holding in San Antonio & A.P. Ry. Co. was based in part on the
telephone and telegraph comprising Atwo
different means of accomplishing the same communicative purpose@).  Like telegraphs and telephones, traditional
media and the internet can exist as two different means of accomplishing the
same communicative purpose.

Fourth, various courts outside of our
jurisdiction have recognized the internet (either implicitly or explicitly) as
a type of nontraditional electronic media. 
See Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc., 528 F.3d
1258, 1261 (10th Cir. 2008) (noting that advertisements occurred in Avarious
print, online, and television media@), cert.
denied, 129 S. Ct. 1006 (2009); Belo Corp., 512 F.3d at 144
(explaining that while there are differences between print media and the
internet, Athe similarities between the two
media support application of a consistent rule@); Gaeth
v. Deacon, 964 A.2d 621, 627 (Me. 2009) (stating that Aan
increasingly greater portion of the population obtains more of its information
through television, the Internet, and other electronic media@); see
also Ostergren v. McDonnell, No. 3:08cv362, 2008 WL 3895593, at *9 n.3
(E.D. Va. Aug. 22, 2008) (opining that Ait might
be said that the [i]nternet has taken over the role of traditional print
media.  It can hardly be contested that
there is an ongoing shift away from traditional print media toward the internet@).








Fifth, appellees have not provided any sufficient
reason to distinguish internet communicators from other electronic or print
media under section 51.014(a)(6). 
Appellees= proposed ruleCthat an
internet author could never qualify as a member of the media under that sectionCwould
make as little sense as an inverse rule that a print author (such as someone
distributing their own photocopied musings) would always qualify as such.

Sixth, recent legislative action supports Kaufman=s status
as a member of the media through his internet publications.  In adding provisions related to a testimonial
privilege for journalists to the civil practice and remedies code in April
2009, the Texas legislature broadly defined Anews
medium@ as

a newspaper, magazine or
periodical, book publisher, news agency, wire service, radio or television
station or network, cable, satellite, or other transmission system or carrier
or channel, or a channel or programming service for a station, network, system,
or carrier, or an audio or audiovisual production company or Internet company
or provider, or the parent, subsidiary, division, or affiliate of that entity, that
disseminates news or information to the public by any means, including:

 

(A)  print;

(B) 
television;

(C)  radio;

(D) 
photographic;

(E) 
mechanical;

(F) 
electronic; and

(G)  other
means, known or unknown, that are accessible to the public.








Act of April 30, 2009, 81st Leg., R.S., H.B. 670, ' 1 (to
be codified at Tex. Civ. Prac. & Rem. Code Ann. ' 22.021(3))
(emphasis added).  Front Page Magazine is
clearly both electronic and accessible to the public; it would therefore
qualify as a Anews medium@ under
the statute, and Kaufman would qualify as a contributor to that medium.  See id. 

Finally, permitting Kaufman to challenge the
trial court=s denial of his summary judgment
motion through this interlocutory appeal promotes one of the objectives of
section 51.014(a)(6)Cit allows us to consider and
sort out appellees= defamation claims before this
case enters the time‑consuming and expensive trial phase.  See TSM AM‑FM TV, 969 S.W.2d at
451.








Rather than using appellees=
exclusive standard, we conclude that an internet author=s status
as a member of the electronic media should be adjudged by the same principles
that courts should use to determine the author=s status
under more traditional media.  In other
words, we hold that a person who communicates facts or opinions through the
internet is entitled to appeal under section 51.014(a)(6) when that person=s
communication, under circumstances relating to the character and text of the
communication itself, its editorial process, its volume of dissemination, the
communicator=s extrinsic notoriety
unconnected to the communication, the communicator=s
compensation for or professional relationship to making the communication, and
other relevant circumstances as the facts may dictate, would otherwise qualify
as a communication covered by that section through more traditional electronic
or print media.

We do not hold, therefore, that everyone who
communicates on the internet would qualify as a member of the electronic media
under section 51.014(a)(6).  Our decision
that an internet communicator may qualify as a member of the media under
certain circumstances is strengthened by recent developments in federal
law.  Specifically, a federal statute
related to the fee charged to media for federal agencies=
disclosure of public information indicates that such media includes any

person or entity that
gathers information of potential interest to a segment of the public, uses its
editorial skills to turn the raw materials into a distinct work, and
distributes that work to an audience.  In
this clause, the term Anews@ means information that
is about current events or that would be of current interest to the
public.  Examples of news‑media
entities are television or radio stations broadcasting to the public at large
and publishers of periodicals (but only if such entities qualify as
disseminators of Anews@) who make their products
available for purchase by or subscription by or free distribution to the
general public.  These examples are not
all‑inclusive. Moreover, as methods of news delivery evolve (for
example, the adoption of the electronic dissemination of newspapers through
telecommunications services), such alternative media shall be considered to be
news‑media entities.

 








5 U.S.C.A. ' 552(a)(4)(A)(ii) (West Supp.
2009) (emphasis added); see also Elec. Privacy Info. Ctr. v. Dep=t of
Def., 241 F.Supp.2d 5, 15 (D.D.C. 2003) (finding that a publisher of a
biweekly electronic newsletter qualified as a media entity).

Because we conclude that Kaufman=s
extrinsic notoriety (through his appearances on television),[25]
his substantial readership, the inherent public concern in the terrorism issues
he reports and opines on, and his journalistic experience would all favor his
qualification as a media defendant under section 51.014(a)(6) if he had
reported his article on Muslim Family Day through traditional media, we hold
that he likewise qualifies as a media defendant although the article was
published on the internet.  Thus, we hold
that under section 51.014(a)(6), we have jurisdiction over his interlocutory
appeal, and we deny appellees= motion
to dismiss the appeal.








          The
Propriety of the Trial Court=s
Summary Judgment Decision

As noted above, Kaufman challenges various
aspects of the trial court=s order
denying his traditional summary judgment motion.  Among his arguments, Kaufman contends that
appellees= defamation claims are barred as
a matter of law because his article and his graphic did not Aconcern@ them.[26]

Standards of review








The standard of review for denial of a summary
judgment is the same as for the granting of a summary judgment.  Wethington v. Mann, 172 S.W.3d 146,
148 (Tex. App.CBeaumont 2005, no pet.); Associated
Press v. Cook, 17 S.W.3d 447, 451 (Tex. App.CHouston
[1st Dist.] 2000, no pet.) (deciding an 
interlocutory appeal filed under section 51.014(a)(6)).  In a summary judgment case, the issue on
appeal is whether the movant met the summary judgment burden by establishing
that no genuine issue of material fact exists and that the movant is entitled
to judgment as a matter of law.  Tex. R.
Civ. P. 166a(c); Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215
(Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671,
678 (Tex. 1979).  The burden of proof is
on the movant, and all doubts about the existence of a genuine issue of
material fact are resolved against the movant. 
Sw. Elec. Power Co., 73 S.W.3d at 215.

When reviewing a summary judgment, we take as
true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant=s
favor.  Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005). 
Evidence that favors the movant=s
position will not be considered unless it is uncontroverted.  Great Am. Reserve Ins. Co. v. San Antonio
Plumbing Supply Co., 391 S.W.2d 41, 47 (Tex. 1965).

A defendant who conclusively negates at least one
essential element of a cause of action is entitled to summary judgment on that
claim.  IHS Cedars Treatment Ctr. of
DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004).  Once the defendant produces sufficient
evidence to establish the right to summary judgment, the burden shifts to the
plaintiff to come forward with competent controverting evidence raising a
genuine issue of material fact with regard to the element challenged by the
defendant.  Centeq Realty, Inc. v.
Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

The requirement of appellees= defamation claims that
Kaufman=s statements Aconcerned@ them

 








Whether statements are defamatory is initially a
question for a court to decide.  See
New Times, Inc. v. Isaacks, 146 S.W.3d 144, 155 (Tex. 2004), cert.
denied, 545 U.S. 1105 (2005). 
Questions regarding defamation liability should be submitted to a jury
only where a publication is of ambiguous or doubtful import.  See id.

To maintain their defamation claims, appellees
are required to show that Kaufman published a defamatory statement that Aconcerned@ them.[27]  See Huckabee v. Time Warner Entm=t Co., 19
S.W.3d 413, 429 (Tex. 2000); WFAA‑TV, Inc. v. McLemore, 978 S.W.2d
568, 571 (Tex. 1998), cert. denied, 526 U.S. 1051 (1999); Fox Entm=t Group,
Inc. v. Abdel‑Hafiz, 240 S.W.3d 524, 531 (Tex. App.CFort
Worth 2007, pet. denied) (op. on reh=g).  To do so, they must demonstrate that Kaufman=s
article was specifically directed towards them. 
Cox Tex. Newspapers, L.P. v. Penick, 219 S.W.3d 425, 433 (Tex.
App.CAustin
2007, pet. denied) (citing Rosenblatt v. Baer, 383 U.S. 75, 81, 86 S.
Ct. 669, 673 (1966)).








In other words, A[i]n
order to entitle one to maintain an action for an alleged defamatory statement,
it must appear that he is the person with reference to whom the statement was
made.@  Newspapers, Inc. v. Matthews, 161 Tex.
284, 289, 339 S.W.2d 890, 893 (1960) (holding Aas a
matter of law that [the plaintiff could not] recover for libel to his person .
. . for the reason that the articles refer[red] to no person who could possibly
be identified as [him]@).  It is Anot
necessary that the individual referred to be named if those who knew and were
acquainted with the plaintiff understand from reading the publication that it
referred to [the] plaintiff@;
however, the Asettled law requires that the
false statement point to the plaintiff and to no one else.@  Id. at 289B90, 339
S.W.2d at 894; see Houseman v. Publicaciones Paso del Norte, S.A. DE C.V.,
242 S.W.3d 518, 525 (Tex. App.CEl Paso
2007, no pet.); Ledig v. Duke Energy Corp., 193 S.W.3d 167, 180 (Tex.
App.CHouston
[1st Dist.] 2006, no pet.) (adding that whether a plaintiff is referred to in a
statement is Aa question of law for the court@).  A Aclaimed
implication@ is insufficient to Aconcern@ a
defamation plaintiff when it is not consistent with the Aplain
language@ and the
Afull
import@ of a
defendant=s statement.  Matthews, 161 Tex. at 290, 339 S.W.2d
at 894.








Appellees are not required to prove that Kaufman
intended to refer to them for his statements to have Aconcerned@
them.  Houseman, 242 S.W.3d at
525.  Instead, a Adefamatory
communication is made concerning the person to whom its recipient correctly, or
mistakenly but reasonably, understands that it was intended to refer.@  Id. at 525B26
(affirming a trial court=s decision to grant summary
judgment for the defendant in a defamation case by concluding that although Asome
actual readers [may have been] mislead[,] . . . a hypothetical reasonable
reader would not be@).  In other words, as the Texas Supreme Court
explained in Isaacks, the elements of a defamation claim are analyzed
through objective standards:

the hypothetical
reasonable personCthe mythic Cheshire cat
who darts about the pages of the tort lawCis no dullard. 
He or she does not represent the lowest common denominator, but
reasonable intelligence and learning. . . .  The person of Aordinary intelligence@ . . . is a prototype of
a person who exercises care and prudence, but not omniscience, when evaluating
allegedly defamatory communications.

 

The appropriate inquiry is objective, not subjective. . . .

 

. . .  Intelligent, well‑read
people act unreasonably from time to time, whereas the hypothetical reasonable
reader, for purposes of defamation law, does not. . . . [C]ourts must analyze
the words at issue with detachment and dispassion, considering them in
context and as a whole, as the reasonable reader would consider them.

 








Isaaks, 146 S.W.3d at 157B58
(citations omitted) (emphasis added); see also Provencio v. Paradigm Media,
Inc., 44 S.W.3d 677, 681 (Tex. App.CEl Paso
2001, no pet.) (explaining that A[a]llegedly
defamatory statements must be construed as a whole, in light of surrounding
circumstances@).

Analysis

Kaufman=s
article, as quoted above, almost exclusively regarded ICNA (which is not a
party to the defamation claims against Kaufman), its activities, its
sponsorship of Muslim Family Day, and its alleged connections to terrorist
groups and radical projects.  To indicate
its focus, the article (with emphasis added)

$                  
refers to Aa radical Muslim
Organization@ that will Ainvade@ Six Flags;

 

$                  
regards ICNA alone as the organization that donated to Hamas;

 

$                  
states that members of ICNA will Aembark on Arlington . . . for their Muslim
Family Day,@ explains that the Adanger that the
Islamic Circle of North America poses . . . is clear,@ and contains further
identifiers such as Athis group,@ Athe group,@ Aits message,@ Aits website,@ Aits youth wing,@ and Athe sponsoring
organization,@ to restrict the article=s import to ICNA; and 

 

$                  
contains only one reference to any other sponsor of Muslim Family DayCIANTCwhich also did not pursue
claims against Kaufman.

 

Likewise, the text accompanying Kaufman=s
graphic (which linked to his article) stated, ASix
Flags Over Texas opens its doors to a group with ties to terror.@








Neither Kaufman=s
article nor his graphic named any of appellees=
organizations.  However, appellees
contend that Kaufman=s article references them in its
first paragraph because it states that Athose
involved with this group=s event, Muslim Family Day, may
very well have found an original and appealing way to spread anti-Western
hatred.@  The context of the statement clearly
indicates that Athis group@ is
ICNA, not any of the appellees, and for the following reasons, we cannot agree
with appellees that a reasonable reader would equate Athose
involved@ to
their organizations merely because they were tacitly incorporated[28]
as sponsors of the event on a promotional flyer.








First, Athose
involved@ is
modified by Athis group,@ and the
statement is therefore reasonably read to limit its inference to those
individuals attending the event under invitation or direction from ICNA.  Second, even if a reasonable reader could
attribute a more expansive meaning to Athose
involved,@ that meaning would be too broad
to encompass only appellees=
organizations.  See Matthews,
161 Tex. at 289B90, 339 S.W.2d at 894.  For instance, Athose
involved@ with
the Muslim Family Day event in general could extend to any of the Ahalal
food vendors@ mentioned in the article, the
employees performing the Bugs Bunny and Friends parade that the article
referenced, Six Flags management, or any patron who became interested and
participated in the event=s activities upon arriving at
the amusement park that day.[29]  There is simply no indication to a reasonable
reader of Kaufman=s article that Athose
involved@ meant
the sponsors of the event other than ICNA or IANT, because the article did not
inform the reader that there were any such other sponsors.[30]  Finally, reading that phrase as appellees
assert it should be read in isolation from the rest of Kaufman=s
article weighs against our task to read the article as a whole, and within its
full context.[31]  See Isaaks, 146 S.W.3d at 157; Provencio,
44 S.W.3d at 681.

Appellees also contend that the term Athose
groups@ in the
article=s penultimate
paragraph Aconcerns@
them.  That paragraph stated,








ICNA=s Muslim Family Day that
will occur on October 14, 2007 is nothing but a charade, created to spread
hatred, but veiled in a way to make the sponsoring organization look
harmless.  Six Flags will play host
to this dangerous farce.  If events, such
as these, are allowed to continue, more and more Americans could become desensitized
to those groupsCfifth columns within our
borders that wish to do us harm.  It is
up to those concerned to speak out against these travesties that threaten our
way of life.  [Emphasis added.]

 

In context, we conclude that a reasonable reader would restrict the
meaning of Athose groups@ to
groups who share the same allegedly harmful goals that ICNA maintains, rather
than to unnamed co-sponsors of the Six Flags event, especially in light of the
reference to the Asponsoring organization.@

Finally, appellees rely on authority regarding
defamation of a group to contend that Kaufman=s
statements Aconcerned@ them,
analogizing his statements to those described in Sellards v. Express‑News
Corp., 702 S.W.2d 677 (Tex. App.CSan
Antonio 1985, writ ref=d n.r.e.).  In Sellards, the plaintiff was one of
four individuals involved in a one-car accident that killed two of the individuals.  Id. at 678.  The first two of three articles in a
newspaper about the accident referred to drug use as a possible causeCone such
article stated that the accident could have been a Adrug-induced
suicide.@  Id. 
The plaintiff sued the newspaper, contending that  the Adrug-induced
suicide@
reference could be read to suggest that every occupant in the vehicle was under
the influence of drugs and that all the occupants intended to commit
suicide.  Id. at 678B79.  In reversing summary judgment granted in
favor of the newspaper, the San Antonio Court of Appeals held that although








the article did not
specifically state [the plaintiff] was involved in drugs or suicide, the
statement, as written, could be taken to refer to any or all of the
passengers.  When a group is named and
the plaintiff is a readily identifiable member of the group, a cause of action
for defamation exists if those who know and are acquainted with the plaintiff
understand the article refers to the plaintiff.

 

Id. at 680.

We do not agree with appellees that the Sellards= holding
affects our resolution of this case. 
Unlike the plaintiff in Sellards, appellees were never named in
any of Kaufman=s publications, and neither was
any particular individual or Agroup,@ such as
the group of four individuals involved in the Sellards accident.  Rather, Kaufman=s
publications (including his article, his graphic, and his protest sign) only
referred to two specific entities (ICNA and IANT); they never referred to any
group of sponsoring organizations of which appellees= organizations
were identifiable members.  Also,
appellees have not cited any cases that apply group defamation theories to
plaintiffs that are themselves groups, rather than individuals.













For all of these reasons, we hold that, viewing
Kaufman=s
statements in his article and his graphic, as a whole and with their full
import, a reasonable reader who was acquainted with appellees would not view
Kaufman=s
statements as Aconcerning@ them.[32]  See 
Matthews, 161 Tex. at 289B90, 339
S.W.2d at 893B94 (explaining that it is Anot
necessary that the individual referred to be named if those who knew and were
acquainted with the plaintiff understand from reading the publication that it
referred to [the] plaintiff,@ but the
Asettled
law requires that the false statement point to the plaintiff and to no one else@); Houseman,
242 S.W.3d at 525B26 (affirming a summary judgment
for the defendant because a hypothetical reasonable reader would not have
understood comments as having concerned the plaintiff).  Because appellees were required to show
that Kaufman=s statements Aconcerned@ them to
maintain their defamation claims, because Kaufman moved for summary judgment on
the ground that the statements did not, because Kaufman has argued on appeal
that they did not, and because we conclude that they did not, we hold that the
trial court improperly denied Kaufman=s
traditional summary judgment motion (which specifically challenged the Aconcerning@ element),
and we sustain his issue regarding the denial of his motion.[33]

                                             Conclusion

Having denied appellees= motion
to dismiss this appeal and having sustained Kaufman=s issue
regarding the trial court=s denial of his motion for
summary judgment, we reverse the trial court=s order
denying his motion and render judgment in his favor.  See Tex. R. App. P. 43.2(c), 43.3; City
of Cresson v. City of Granbury, 245 S.W.3d 61, 64B65 (Tex.
App.CFort
Worth 2008, pet. denied) (op. on reh=g).

 

TERRIE
LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, WALKER and MEIER, JJ.

 

DELIVERED:  June 25, 2009











[1]The introductory portion
of Kaufman=s brief signals that he
is raising eleven issues; however, the listed issues do not directly correspond
to portions of Kaufman=s brief, and the issues
all relate to various aspects of the propriety of the trial court=s summary judgment
decision.





[2]A Masajid is a mosque.





[3]The website can be
accessed at http://www.frontpagemagazine.com.





[4]Neither ICNA nor IANT
were plaintiffs in this suit.  Jamal
Qaddura, president of appellee DFW Islamic Educational Center, Inc., testified
during his deposition that this lawsuit was the first time he had heard of ICNA.  Nothing in the record indicates that any
of appellees= organizations have any
formal connection with either ICNA or IANT.





[5]Halal food is prepared in
conformity with Islamic religious guidelines.





[6]This bracketed sentence
appears as part of Kaufman=s original article.





[7]This omitted portion of
Kaufman=s article contained two
paragraphs related to the content of the forums on the YM and Why Islam?
websites.





[8]Appellees have asserted
that a Afifth column@ is a Agroup of secret
sympathizers or supporters of an enemy that engage in espionage or sabotage
within defense lines or national borders.@





[9]The fourth amended
petition is appellees= most recent
pleading.  The record indicates that
Appellees filed their first and second amended petitions in October 2007 and
that they filed their third amended petition on April 4, 2008.  However, none of these petitions are included
in our record on appeal.





[10]The fourth amended
petition did not include any claim for intentional infliction of emotional
distress; it contained only defamation claims. 
Qaddura, submitted an affidavit regarding Kaufman=s articles that appellees
attached to the petition.  In part, the
affidavit asserted that Kaufman has Adelusional rantings,@ that he is a Aradical on the Israeli
side of the international debate over Palestine,@ and that he Awishes to stir up anger,
resentment, bias, and hatred of peaceful, law abiding citizens, solely because
of their religion.@  Qaddura attached to his affidavit, among
other exhibits, Kaufman=s article on Muslim
Family Day, a press release regarding Kaufman=s protest, and a Fort
Worth Star-Telegram article about the protest.





[11]Specifically, Jehad
Alasad, president of appellee Islamic Society of Arlington, Inc., stated that
his organization, a Aprivate corporation which
generally seeks to avoid media attention,@ had spiritual and community purposes unrelated
to terrorism.  He explained his group=s association with Muslim
Family Day as follows:

Essentially, if a group
guaranteed that its members would purchase a minimum number of tickets, the
group could promote its event at Six Flags . . . .  In the summer of 2007, a number of groups . .
. entered into an agreement with Six Flags to promote [Muslim Family Day].  These groups included [appellees]. .
. .  Six Flags agreed to set aside
the Music Mill Theater for participants of Muslim Family Day to gather, to
participate in the daily Islamic prayers if they wished, and to permit vendors
to make Halal food . . . .

 

Alasad also recited that
he viewed Kaufman=s article and graphic
about Muslim Family Day, and he contended that the article signaled to him that
Kaufman alleged that the organizations sponsoring Muslim Family Day promoted
terrorism.  Other representatives from
the other appellees submitted similar affidavits.





[12]In their appellate brief,
appellees have again admitted that much of Kaufman=s article was Adevoted to discussions of
the [ICNA] and the [IANT], neither of whom are parties to this case.@





[13]Appellees= motion further
contended,

 

by juxtaposing statements in the article relating to . . . the
terrorist sponsorship of ICNA and IANT with statements regarding the Six Flags
event and its sponsors and participants, the article conveys the false and
defamatory message that the sponsors and participants are engaged in an event
that promotes anti-Western hatred, terrorism, espionage, and sabotage.





[14]The transcript came from
the deposition of Qaddura, who testified in part that Kaufman=s article terrified him
of being harmed when he attended Muslim Family Day and that Kaufman branded Aany Muslim that attended
the event as a terrorist.@





[15]Specifically, the trial
court sustained objections to (1) two lists of AUnindicted
Co-conspirators and/or Joint Venturers@ filed in a federal criminal case; (2) an
attachment allegedly related to terrorism donations; (3) printouts of web pages
related to appellees= addresses; and (4) the
Google search result printouts.  The
court denied the remainder of appellees= objections. 
Kaufman has not raised any issue on appeal related to the trial
court=s decision to sustain
appellees= objections; therefore,
we will not consider any of the documents that the trial court excluded.  See Tex. R. App. P. 38.1(i); Inglish
v. Prudential Ins. Co. of Am., 928 S.W.2d 702, 706 (Tex. App.CHouston [1st Dist.] 1996,
writ denied) (op. on reh=g).





[16]The order stated that the
court denied Kaufman=s summary judgment motion
that he filed on October 27, 2009Cthis was Kaufman=s traditional motion.





[17]Kaufman also relied on
section 51.014(a)(6) in his notice of appeal that he filed with the trial
court.





[18]Chapter 73 of the civil practice
and remedies code establishes some statutory elements and defenses of libel
claims.  See Tex. Civ. Prac. &
Rem. Code Ann. '' 73.001B.006 (Vernon 2005).  Kaufman=s traditional summary judgment motion contained
contentions regarding chapter 73 and the First Amendment, and appellees= summary judgment motion
sought relief under chapter 73 (although their petition had not cited to that
chapter), along with common law defamation.





[19]Like the parties, we have
not found any Texas cases that squarely address the issue of an internet author=s status as a member of
the print or electronic media under section 51.014(a)(6).





[20]We may consider documents
submitted by the parties that are outside of the trial court=s record for the purpose
of determining our own civil jurisdiction. 
See Tex. Gov=t Code Ann. ' 22.220(c) (Vernon 2004); Sabine Offshore
Serv., Inc. v. City of Port Arthur, 595 S.W.2d 840, 841 (Tex. 1979); Kenseth
v. Dallas County, 126 S.W.3d 584, 593 (Tex. App.CDallas 2004, pet.
denied); see also Lindsey v. Kline, No. 02‑03‑00239‑CV,
2004 WL 1699909, at *2 (Tex. App.CFort Worth July 29, 2004, no pet.) (mem. op.)
(stating that we may Aconsider affidavits or
other evidence not included in the appellate record to determine our own
jurisdiction@).

 

In response to appellees= motion to dismiss this
appeal, Kaufman filed a declaration from David Horowitz and an additional
affidavit from himself, documents that are not in our appellate record, in an
attempt to strengthen his claim that he satisfies the criteria of section
51.014(a)(6).  Appellees filed objections
and a motion to strike these additional documents, contending that there is no
authority for adding new evidence to the appellate record and that Horowitz=s declaration did not
satisfy the requirements of an affidavit under Texas law.  Kaufman filed a response to appellees= objections and motion to
strike, and he also filed an affidavit from Horowitz as a substitute for
Horowitz=s declaration.  In his response, Kaufman stated that he
submitted Horowitz=s declaration as Aproof responsive to a
motion to dismiss an appeal.@

 

Based on the
authority cited above, we will consider Horowitz=s affidavit and Kaufman=s additional affidavit
for the limited purpose of determining our jurisdiction over this interlocutory
appeal under section 51.104(a)(6), which is an issue that, of course, could not
have been litigated in the trial court. 
We will not consider the additional affidavits for any other purpose,
including the propriety of the trial court=s summary judgment decision.  We therefore overrule appellees= objections and their
motion to strike Kaufman=s additional affidavits.





[21]Appellees assert that
Kaufman is not a media defendant under section 51.014(a)(6) because Front Page
Magazine is not a Aprinted newspaper or
magazine, or part of a radio or television broadcast.@  They further contend that Kaufman Ais asking this Court to
make the unprecedented ruling that postings made solely to the internet by an
individual should be accorded the same >media defendant= protections as
newspapers, magazines, and radio and television stations.@





[22]Appellees do not contest
the fact that Front Page Magazine, through its internet existence, is Aelectronic@ in nature.





[23]Appellees assert in their
brief that the internet Ahas become a combination
of gossip fence, coffee house, back alley, and bathroom stall for the
dissemination of gossip, rumor, innuendo, and outright falsehood.@





[24]Specifically, the Court
stated that the internet is comparable to

 

a vast library including
millions of readily available and indexed publications . . . . 

 

From the publishers= point of view, it
constitutes a vast platform from which to address and hear from a worldwide
audience of millions of readers, viewers, researchers, and buyers.  Any person or organization with a computer
connected to the Internet can Apublish@ information. 
Publishers include government agencies, educational institutions,
commercial entities, advocacy groups, and individuals.  Publishers may either make their material
available to the entire pool of Internet users, or confine access to a selected
group, such as those willing to pay for the privilege.

 

. . . .

 

. . .  This dynamic, multifaceted category of
communication includes not only traditional print and news services, but also
audio, video, and still images, as well as interactive, real‑time
dialogue.

 

Reno, 521 U.S. at 853, 870,
117 S. Ct. at 2335B36, 2344 (citations and
footnotes omitted).





[25]The Houston (Fourteenth)
Court of Appeals has noted that the legislative history of section 51.014(a)(6)
indicates that the section should cover individuals who Aexpress their opinions on
radio or television programs.@  Quebe
v. Pope, 201 S.W.3d 166, 170 n.5 (Tex. App.CHouston [14th Dist.]
2006, pet. denied).





[26]Kaufman therefore urges
through a title in his brief that appellees lack standing, but in the body of
his brief and in his reply brief, he also specifically contends that because
his article and graphic did not concern appellees, they cannot satisfy the
elements of their defamation claims as a matter of law, and his motion for
summary judgment should therefore have been granted.  Kaufman likewise asserted in the trial court
that appellees= failure to sufficiently
connect any of his statements to them resulted in both their lack of standing
and in their inability to establish the elements of their defamation claims.





[27]This requirement applies
to common law defamation claims and also to libel claims brought under chapter
73 of the civil practice and remedies code; chapter 73 incorporates Aa defamation@ into its definition of
libel.  See Tex. Civ. Prac. &
Rem. Code Ann. ' 73.001; Pisharodi
v. Barrash, 116 S.W.3d 858, 861 (Tex. App.CCorpus Christi 2003, pet.
denied) (listing the Aconcerning@ requirement among the
elements of a libel claim).





[28]Again, the flyer globally
included all DFW mosques and Islamic centers as the event=s sponsors.





[29]Appellees represent in
their brief that most of the visitors to Six Flags on the day of the event were
not Muslims.





[30]In fact, portions of the
article would signal to a reasonable reader that there were no other sponsors
of the event.  For instance, the article
states that ICNA Aruns@ its family entertainment
events and relates that it Arent[s] out@ the amusement parks for such events.





[31]As is indicated above,
the majority of Kaufman=s article did not concern
Muslim Family Day at all; rather, it concerned ICNA=s relation to terrorist
individuals and groups and ICNA=s internet activities.





[32]Appellees assert in their
brief that Kaufman=s ASix Flags Over Terrorists@ sign also Aconcerned@ them.  Neither appellees= pleading nor their
summary judgment motion focused on Kaufman=s protest sign as a communication from which they
based their defamation claims.  In the ASummary Judgment Sought@ portion of their motion,
they limited the issues on which they sought judgment to those related to
Kaufman=s @September 28, 2007 >article= and >graphic.=@  Also, in the context of Kaufman=s article that preceded
Kaufman=s protest and the display
of the sign, we conclude that a reasonable reader of the sign would associate
it with Kaufman=s criticism of ICNA and
IANT, and not with appellees= groups.





[33]Because we have reached
this conclusion as a matter of law, we decline to address Kaufman=s alternate but related
contention that because his statements did not Aconcern@ appellees, they lacked
standing to bring their claims.  See
Tex. R. App. P. 47.4.  Likewise, we need
not address the other issues raised by Kaufman relating to the merits of
appellees= defamation claims.  See id.  Finally, by sustaining Kaufman=s challenge to the trial
court=s denial of his summary
judgment motion and rendering judgment in his favor, we do not express any
opinion as to the merit or truthfulness of his article at issue.